The first case on the docket this morning is people against Branham, 5-240682. Counsel for the appellant, you may proceed. Please state your name for the record. Yes, Your Honor. Chris Evans of the Office of the State Appellant Defender for Mr. Branham. Good morning, Your Honors, and may it please the Court. In the limited time that I have today, I'd like to focus my argument on the first issue you raised. Namely that Mr. Branham's defense attorney provided ineffective assistance to counsel during his trial when he failed to object to the State's unfettered use of multiple instances of other crime evidence, failed to articulate and object when the State didn't identify what that other crime's evidence was being admitted for, and then failed to ensure that the jury was properly instructed in the law to consider that evidence solely for whatever admitted purpose it was in there for. For multiple decades, starting with people of E. Donohue in the Illinois Supreme Court and recently in the Supreme Court decision this March, if that was the subject of my motion to cite additional authority, Illinois courts recognize that other crime's evidence is powerful. It tends to over-persuade. Thus, it was objectively unreasonable for the defense attorney not to hold the State to the proper processes that Illinois courts have developed when other crime's evidence seeks to be admitted. If it's propensity, that's Section 113-7.3. If it's for other purposes, such as intent, motive, plan, or other illuminated reasons in Illinois Evidence Rules 404B and C, then there's a process for this. You just don't get to walk it in and say anything you want. The State needs to come forward, identify the other crime's evidence it wants to use, and identify for what proper purpose. And then the trial judge just wants to hold a hearing that decides if any of the other crime's evidence comes in, but if it does come in, for what limited purpose. So everyone knows, and that can be properly then done and presented at the trial. It was objectively unreasonable for counsel not to do any of that. And the result was other crime's evidence, a specific instance of conduct, was twice as much. For instance, a specific conduct that was never charged, along with hundreds of other allegations of attacks that were never charged, were all submitted to the jury, and the jury had no idea how it was supposed to consider that evidence. And that's the second reason of why he was objectively unreasonable, is because IPI Instruction 3.4 is there from the committee notes because it is powerful evidence brought to the jury. It's one of the only jury instructions in the entire Illinois pattern of instructions that the committee notes say, best practice, this should be presented twice. First, when the other crime's evidence is first presented to the jury so they understand that they're hearing this, but they're only supposed to consider it for a very limited reason. And then again, at the end of trial, with all the other criminal jury instructions. Trial counsel didn't do any of that. And because of that, the jury was left to their own devices to consider the evidence for any reason that they wanted. And under Strickland, that was prejudicial. And that's what our primary argument is here, is that it was prejudicial. And there is a reasonable probability that the outcome would have been different if the jury had been properly instructed, so that evidence would have been eliminated or at least limited to a single purpose, not for anything the jury considered. Because the jury did hear evidence of multiple attacks, hundreds of attacks, supposedly on A.H. There was a mini-trial of the testimony of A.H. and J.H. about an incident that supposedly took place in her bedroom. None of that was charged, and it was prejudicial because the state then used that evidence in their closing argument to say, because J.H., who testified by other crimes' evidence that was never part of charged conduct, corroborated with A.H., who testified about other crimes' evidence that was never charged, they must be telling the truth. Therefore, if she's telling the truth about this other crimes' evidence that was never charged, then she must be telling the truth about the two specific incidents that she testified to. And that is bolstering the credibility of A.H., which Finvold, for the Illinois Supreme Court, started in our brief from decades ago, says that's an improper use of other crimes' evidence. And I know myself and opposing counsel, we've started competing in aspects of cases about when you can bring other crimes' evidence in to corroborate something. But even the state's own evidence talks about corroboration. It's more of a misnomer, but the corroboration has to be for other charged conduct. J.H. never testified to other charged conduct. He testified to other crimes' evidence corroborating that. And the word corroboration is being used instead of, I guess, a more proper thing than plan, motive, intent. And that's what really some of these cases like Foster, the state talks about, and even Finvold is getting to. We don't want to bolster credibility, but if we're going to admit other crimes' evidence, it has to prove something at issue at trial. In the Foster case, set up by the state, that was basically the intent of the person there, who admitted that he touched these other young victims, but he said it was a proper medical examination. So evidence brought in wasn't to corroborate the testimony of charged conduct. It was really to show plan. This is what he attempted to do. He tried to have his fingers split, in a way. So that's under Illinois Rule Evidence 404 B and C. That's for a proper purpose. But corroboration isn't something that you prove up as an elemental trial. Corroboration is the victim said X happened to me. Corroboration is another person saying X happened to that. That's corroboration. But if that's the evidence being admitted, that's not other crimes. That's what actually happened, because that's the charged conduct. And that's what all the authorities that myself, in opposing counsel, have cited, agree upon. If it's to the actual thing that's charged, that's admissible evidence and can be used. But for other crimes evidence, as the authorities recognized, it is powerful. It can overpersuade. And that's what happened here, because the jury was left with their own devices. At the end of the day, the circuit court judge was required to instruct the jury on the law of what they're supposed to consider. That's a standard understanding. It happens every day in Illinois courts. But the jury was never told the law. They couldn't do their job under Illinois law to only consider other crimes evidence for the limited person who was admitted, because they were never instructed about that. What specific instruction should they have received? Well, the IPI 3.14. I don't have it laid out. Because, again, I don't know why it was admitted. IPI 3.14, Your Honor. How would it have changed the outcome in the credibility case, though? How does the limited instruction make that much of a difference in this case? Well, it makes that much of a difference because before we even get to the IPI, there's the limiting of what it's used for. It allows the defense counsel to know how the state's going to use it. And the jury is told they can only consider it for stuff. And considering for credibility is not one of the purposes, Your Honor. They can't consider it for credibility, because Stengel, the Supreme Court, says you can't. And so that makes a reasonable probability. And, again, we're not arguing that he would be acquitted. That's not our burden under restriction. But there is a reasonable probability. If the evidence was first limited or some of it kept out, and then the jury was promptly instructed on how they can consider it, there would have been a reasonable probability of different outcomes. And so, Your Honor, I didn't mean to cut you off there. I have one more question. Yes. What about your alternative critical argument about the failure to subpoena the medical examiner? Yes. And I'd like to hear you address that. Sure. Absolutely. At the first part of the clinical hearing, defendant is prosaic. They have no counsel. They're not required to bring in a whole bunch of evidence or affidavits. They have to show that there is a possibility of neglect that isn't rebutted by the record. And here they did that. Defense counsel wanted the medical evidence in. He had continued this for months to try to get an expert or some other way of getting that in. He even subpoenaed the person who testified, who did the examination and would have testified that there was no damage to the AHS hymen. But he didn't subpoena her. He tried to get it in through AHS testimony. So he failed to get that evidence in when he had a very simple reason to do that, subpoenaed the person who did the examination, asked her the questions. The fact that it might have caused direct examination, cross-examination, and redirect that talked about the evidence and whether that is showing potentiality of sexual assault or whether that can be still intact and there still be sexual assault. But that's evidence, and there's arguments to be done for that. But the evidence is there, which everyone, the State, defense attorney, recognized was powerful. That's why it was disclosed, and that's why he got the continuity report. And that's why. Wasn't her testimony that this sexual activity took place twice a week and was penetrative? It was wrong, and that's my understanding. It was the basis of why he wanted to present that to the jury so that that may be a contradiction that they could argue about in closing arguments for that. Likewise, the aspect of the witnesses that he's testified, Mr. Brannon said that I told my attorney about, but he never interviewed them. It can't be strategic not to call a witness if you have no idea what the witness is going to say. And that wasn't rebutted by the record. And as the alternative argument we're saying shows, that should be at least at the minimum a remand for additional criminal accusements. If there are no further questions, Your Honor, I will sit down, but I will certainly take questions if there are. Any questions? No, sir. Thank you. Thank you, Your Honor. Okay. Thank you. Do you have an opportunity for rebuttal? Yes, Your Honor. Good morning, Your Honors. May it please the Court. Mr. Evers, Trent Marshall for the State. At the outset, I'd like to correct a few things that I found in the State's brief. I'll just prepare it. Top of page 16, the quote that Brown angles should technically be paragraph 24, not 22. And on page 13, where I say, the uncharged acts were disclosed prior to trial, it should say, with the exception of the wood stove incident, the uncharged acts were disclosed prior to trial. In the original police report, the most important thing I think about the original police report is that it disclosed that the victim was claiming that the abuse occurred for two years, first year consisting of molesting or groping, second year raping. And as this Court noted in the last appeal, her claims are ultimately consistent with her trial testimony. By my count, between the acts that she specifically discussed and her brother, six. Six total. Four of those were uncharged. The counsel is presumably competent. I think here he demonstrated himself competent. He went two for two on his motions in limine. Competent, aware of the case law. Would have known in a situation like this, in a case like this, when you're dealing with volume charges in the same victim, that it didn't matter if it was charged or uncharged, it was admissible. And I'll read from this Court's decision in Foster. The laws as well as status in the trial for sexual offenses, evidence of a defendant's prior sexual activities with the same child, is an exception to the general rule that a defendant's prior bad acts are not admissible. Such evidence is admissible to show the relationship and familiarity of the parties, to show the defendant's intent, to show the defendant's design or course of conduct, and to corroborate the victim's testimony concerning the offenses charged. Cite Brown-Engel for similar credibility and context considerations. Now here, one of the uncharged acts, the victim described as, the first thing I remember, the first time anything happened. She's going to remember that. Two of the others involved the conduct that her brother walked in on. So that was corroborative. So I think under the circumstances, it was entirely reasonable for trial counsel... The motion wasn't made on that? I was about to say, I think it's reasonable to presume that trial counsel would have known that filing a motion would have been futile. This was not introduced for propensity under 115.7-3. There's never a notice given. It was never used that way. So now the defendant claims that even if... Can I ask you another question? Yes, sir. I forgot to ask this, and I'll ask it on the phone. Does the recent Supreme Court case have anything to do with this case? In my opinion, no, sir. What about the limited instruction? Can you get there? That's exactly where I was going. Okay, thank you. So he said, well, even if it would have been a waste of time to try to object to the uncharged because they were admissible for those purposes, he should have sought a limited instruction. In my opinion, that would have totally messed up his strategy. And what he did was he's convincing the jury, don't believe anything they say. So it would be kind of incongruous to say, oh, and if you consider those, just consider them for a limited purpose. He also subtly suggested that uncharged was equivalent to unbelievable. And it's hard sometimes to put these contextual arguments in context, so if you'll indulge me. Closing arguments are R-598 through 614. I'm just going to hit some highlights and just kind of give a sense of what was going on here. So the state starts out. It all begins with a report to her psychiatrist. She recounts having been sexually assaulted for two years, give or take, up to two times a week over a two-year period. That's a long time. It started with groping, groping on a regular basis. One day he raves her. This is a process or a pattern that will repeat the next year. We have numerous times where she was able to recount some memories. Talks about the camper incident, talks about the hoodie incident. Then he addresses all this stuff about it's a conspiracy. Then he goes, the bottom line is this happened repeatedly, over and over and over again, two times a week for 52 weeks in a year. That's 104 times. I'm an attorney. I'm not good at math. So 104 times is a lot. And then he discusses the incidents where the brother walked in, said how it was corroborative. They were unequivocal about what they saw. Then we get to defense counsel. He hammers the drum, beats the drum. There's no physical evidence we've seen. Nothing. They can't keep their story straight. Even when they describe the same incident, different versions. Makes no sense. Can't recall details. She's a troubled young girl. How better in 2021 America to get rid of someone than to point a finger at them and call them a sex offender? How better to get rid of them? Their lives are better now that he's out of their lives. Then here we go. Now, let's talk about a technical argument lawyers like to make. The indictment, five counts, five separate acts. Well, she told us about four. The bed, the wood stove, the shed. I don't know what the fifth one was. Because they just give it this sort of generic twice a week for a year, two years, whatever it was. And we're supposed to infer that there was a fifth act. Then we discuss it with the brother witness. That's not charged, by the way. And he jumps right back in. You'd think with this much abuse, there's going to be medical evidence. No medical evidence. Can't get their facts straight. None of this makes sense. Pips back to the state. Hey, we didn't allege more than four acts. Okay, two times a day, two times a week, for a year. On that amount, that's still more than four. And he basically says, sorry, the victim didn't take notes. So with that going on, and him saying, you can't believe any of this. It's all bunk. They didn't even charge that one. Modified 3.14. Comments say you can modify the heck out of it to fit the facts of the case. So if I'm trial counsel, do I want them to go back there and say, and read this, evidence has been received, and the victim has been involved in other offenses other than those charged. This evidence was received on the issue of the party's relationship, the defendant's intent, the defendant's design and course of conduct, and corroborate the victim's testimony. It is for you to determine whether he was involved in the offenses and whether they should be used for those reasons. I think that would have hijacked his strategy, in my opinion. So I think it was a reasonable strategy under the circumstances. With respect to the Krenkel thing and the expert's report, we don't have a report. I don't know what it says. I don't know if the trial court said. Is there something in the record about the report said that there was no damage to the hymen? It said, it didn't say zero damage. It didn't say zero damage. It indicated there were some. And then this was not inconsistent with abuse. And then in the state's brief, fully set out the context, he tried to talk to her. He tried to get that stuff in. And I think the mystery here, and I don't have the report, and I don't have everything. I don't have the CAC interview. But when you consider what she said was about to occur when her brother walked in, then Koch's report starts to make more sense. And I think relatedly, the fact that the victim's forensic interview with Robin Carr wasn't admitted, pursuant to 115-10, was not a coincidence. And I've seen this a time before. I think there were things that the victim didn't want to get into. Are there any questions? I'll let it go at that. Are there any other questions? No, sir. Thank you for your time. I'd ask that you affirm the conclusion. Thank you. Thanks. Your Honor, you would ask a question about whether SMARC matters to this case. Yes, it does. To the extent that, surely, it talks about, again, the power of other crimes evidence. Now, it came out clearly after this trial took place, so that none of the parties had the, I guess, instruction of how this evidence was supposed to go through. But it reinforces that other crimes evidence, before it's admissible, goes through a hearing, even if it's not under Section 115-7.3. Other crimes evidence under Evidence Rule 404B and C still goes through a hearing because it's for a limited purpose. It's not we get to admit it and talk about it, and then, after the fact, we have to justify what limited purpose is like. But what about this idea that it was strategy, that it was the strategy of the attorney? They're not mutually exclusive in that. You can have that strategy, but keeping yourself, as a defense attorney, ignorant of what other crimes evidence the State is going to admit for what limited purpose, before trial, even when in opening argument they mentioned it, so trial counsel knew exactly what they were going to say during the entire trial then, that's not strategy because it's not mutually exclusive. You can talk to the jury about it. But if nothing else, the record shows he didn't even contextualize it or go under the committee notes of objecting to not giving 3.14 or telling the judge he didn't want 3.14 in there. He didn't participate or think about that. And it was prejudicial to that. I had... Did you file a motion to cite additional authority? For people to be smart, I did, Your Honor. That was granted. I mean the Supreme Court version of it. Mr. Marshall, do you have any objections? I apologize. No, I don't intend to file a response to it. It's fine. You do want to file a motion? No, I don't. Okay, so... Sorry, Your Honor. I presumed I could mention that case. That was not an objection. That motion is admitted. I mean it's granted. So... I apologize, Your Honor. I was not trying to jump ahead of things there, too. I knew you had thought of that motion. Okay. That's why I asked. No, of course, but we need to keep everything... But yes, I do think it's relevant. As for the fact, the report, and this is in the record, her hymen was intact. That is the phrase that was used that we have in the record and the parties talked about when it was disclosed by the state. That's what they spoke about. There needs to be the hearing in the absence of the... Do you have any report on that? Is there any report in the record to that effect? I don't have it before me, Your Honor, in that kind of situation. But part of the... They discussed it on the record. Everyone agreed that it was evidence that the defense wanted to use. Defense counsel repeatedly tried to use the testimony. They would have never submitted the report, of course, anyways. They would have had testimony about it. Finally, the idea that opposing counsel was talking about J.H. was corroborating what A.H. said about the bedroom. That kind of breaks my point, Your Honor. That was a mini-trial, an uncharged conduct. The jury could use that for any reason they wanted to. It wasn't corroborating any of the charges, not specifically, since there was only two opposing counsel on it. And opposing counsel was also correct how they described the closing arguments. Yes, there was argument there. But, Your Honor, to go back to your question about whether this is strategy, trying to limit the evidence is always a defense attorney's responsibility. Letting more evidence come in, letting the state do more argument, letting the jury have no guidance how they can conceivably use it, such as for propensity or to bolster A.H.'s credibility, which the courts do not allow, that can't be strategic or helpful, Your Honor. And if there are no other questions, then I will take my leave and ask that you reverse the convictions and draw a decision. Thank you, Your Honors. Let's take this matter under advisement and issue its decision in due course.